# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

**Randle**                                    **Civil Action No. 6:17-Cv-00852**

**Versus**                                    **Unassigned District Judge**

**Commissioner**                              **Magistrate Judge Whitehurst**

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be AFFIRMED.

### ADMINISTRATIVE PROCEEDINGS

The claimant, Janita Randle, fully exhausted her administrative remedies prior to filing this action in federal court.   The claimant filed an application for disability insurance benefits ("DIB") and an application for supplemental security income benefits ("SSI"), alleging disability beginning on July 5, 2012.[1]   Her applications were denied.[2]   The claimant requested a hearing,[3] which was held on December 9,

---

[1]        T. 20, 175-176.

[2]        T. 81.

[3]        T. 86.

ˇ1ˇ

2015, before Administrative Law Judge Mary Gattuso.[4]   The ALJ issued a decision on January 26, 2016,[5] concluding that the claimant was not disabled within the meaning of the Social Security Act ("the Act") from July 5, 2012 through the date of the decision.   The claimant asked for review of the decision, but the Appeals Council concluded on April 28, 2017 that no basis existed for review of the ALJ's decision. [6] Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g). The claimant then filed this action seeking review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant was born on July 18, 1966.[7]   At the time of the ALJ's decision, she was 49 years old. She has a high school education.[8] She has past relevant work experience as a cashier and recreational aide.[9]   She alleges she has been disabled since July 5, 2012 due to Addison's Disease and depression and anxiety.

---

[4]     T. 36.

[5]     T. 17.

[6]     T. 14.

[7]     R. 8.

[8]     T. 41, 79.

[9]     T. 29-30; 63.

Claimant's medical care with her internist, Dr. Melancon, began in January 2012, at which time her records indicate she had suffered with fatigue and depression for 5 months. She was on daily doses of Synthroid and Cortisone Acetate, and also received Prozac and Atenolol. T. 254, 255, 262, 264, 268, 281. Blood tests had multiple abnormal findings, including a very low cortisol level. T. 258, 260. Claimant presented to Dr. Melancon several times with swollen grands, sore throat abdominal pain and upper respiratory infection. T. 267-282.

Claimant was seen by an endocrinologist, Dr. Alan Burshell, M.D., at Ochsner Foundation in New Orleans from March 2013 through March 2014. The records reflect a history of an Addison's Disease diagnosis in 1989, that she was taking Prednisone in 1991, and since that time had been on daily Hydrocortisone for over 20 years. T. 336. In March 2013, her Cortisol and TSH were both low. T. 345, 349. In July 2013 it was noted in conjunction with her Addison's diagnosis that both ACTH and Cortisol were low. T. 359. Her Cortisone dosage was changed from 20 milligrams once per day to 15 mg and 5 mg in two separate doses. T. 362.

Ochsner records of November 2013 indicate that since lowering her Cortisol and increasing thyroid medication, claimant had lost weight and her blood pressure was low. Her physician described an "unusual case with evidence for secondary adrenal insufficiency and hypothyroidism." T. 369. It was noted that her last crisis

˘3˘

was in July 2012 secondary to a flu infection. T. 369. Her Cortisone was increased from 15/5 to 20 mg. She was also given a Dexamethasone emergency kit. T.371.

Claimant presented for follow-up in March 2014. She was still feeling fatigued, but better since the last visit. She had not taken her medications for one week in February 2014, but received a steroid injection at the Urgent Care Clinic and doubled her medication dose for one week, with good results. She exhibited a normal mood and affect. T. 377.

The record indicates that claimant first received mental health treatment from Sharon Steward, M.D., with whom she was treated for depression in 10 Sessions between February 2013 and January 2014. T. 315-325. During that time, Dr. Steward discussed with claimant the correlation between her mood swings and her Addison's and Thyroid conditions. T. 319, 327. Dr. Steward documented the claimant's positive response to counseling with a "much improved mood" in December 2013, T. 322, T. 329, and indicated that her Global Assessment of Functioning (GAF) score went up to an 80 by January 8, 2014. [10] T. 325.

---

[10] "The GAF scale is used to rate an individual's "overall psychological functioning." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV") 32 (4th ed. 1994). The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status. A GAF score in the range of 71 to 80 indicates transient symptoms or expected reactions to stressors resulting in no more than a slight impairment in social, occupational, or school functioning. The GAF scale was omitted from DSM–5 because of its "conceptual lack of clarity ... and questionable psychometrics in routine practice." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–5") 16 (5th ed. 2013). However, GAF scores continue to be considered evidence. "We consider a GAF rating as opinion evidence. As with other opinion evidence, the extent to which an adjudicator can

A consulting psychologist, Dr. Fontenelle, evaluated claimant on March 25, 2014, at the request of the State Agency.[11] While he noted that her IQ test results placed her in a "Low Average" category, he thought that "Anxiety and Nervousness may limit her true intellectual capability." T.412-413. He described that claimant is: (1) capable to understand job instruction; (2) says she enjoys performing helping type tasks delivery food to the elderly; and (3) is able to concentrate to a limited extent although she is anxious and depressed. T. 414. At that time Dr. Fontenelle noted that claimant "is not receiving medication;" "does receive counseling but discontinued medication through outpatient mental health." T. 413-414. He diagnosed Generalized Anxiety Disorder and Depression Disorder. T.414.

Records and a "Medical Source Statement" prepared on September 17, 2014, were supplied by a psychiatrist, Dr. Ravindra Reddy. T 429. The record documents 10 clinical visits with Dr. Reddy from March 12, 2014 to August 20, 2015, with a diagnosis of Major Depressive Disorder and Generalized Anxiety Disorder. T 424– 496.   Claimant's medication regimen included Lexapro, Seroquel, and Xanax.

---

rely on the GAF rating as a measure of impairment severity and mental functioning depends on whether the GAF rating is consistent with other evidence, how familiar the rater is with the claimant, and the rater's expertise." *Jackson v. Colvin*, 2015 WL 7681262, at *8 (N.D. Tex. Nov. 5, 2015) (Administrative Message 13066 attached as an exhibit to the opinion)." *Prevost v. U.S. Commissioner, Social Security Administration*, 2018 WL 3567416, at *7 (W.D.La., 2018)

11  Referred by Picou, Claim Examiner, Office of Family Support. T. 411.

T.426. Dr. Reddy felt that claimant had "marked" impairments in interacting appropriately with supervisors and the public, as well as responding appropriately to "usual work situations and to changes in a routine work setting" and "Moderate" impairments in interacting appropriately with co-workers." T.435. During her appointments from March 2015 to June 2015, claimant indicated that she was "doing OK" with "some" depression at times. During those appointments she also indicated she was in compliance with taking her medications. T. 493-496. On her last visit in August 2015, however, she reported that she was "doing worse" and that she "stopped her medication on her own and has done much worse." T. 492.

At the December 9, 2015 hearing, claimant testified that while she had days free of symptoms from her Addison's Disease, she had 3 or 4 days per week when she felt poorly because of an infection and/or depression. She stated that this caused her to stay in bed for four days about once a month. She felt she could not do an 8-hour job, both from the effects of physical problems and depression. T. 45, 49-50, 52-53.

As to claimant's work activities, the records indicate she was able to work full-time at a Navy Exchange department store from May 1998 to January 2001 and in part-time jobs from March 2005 to January 1, 2014, the date she applied for disability benefits. T. 192. Specifically, claimant worked part-time starting in the

fourth quarter of 2013 and extending into 2014, delivering meals for the Council on Aging five days a week, three hours per day. T. 41.

With regard to her activities of daily living, claimant testified that she lives with her husband and during the day, she plays with her puppies, watches television and reads the newspaper, but is unable to watch a two hour movie without falling asleep.   She is able to cook and clean at her own pace. She shops once a month with her husband. They visit their son who attends college in Lafayette, and eat out. She visits with her sister. She drives occasionally after being cleared by her cardiologist in January 2015, but she is afraid that she will pass out when driving.[12]

The ALJ posited 3 hypothetical scenarios to the testifying vocational expert. Hypothetical (1) being off task 20% of the work day, and (2) being absent for 2 days per month, yielded testimony that there was no work in the economy.   The third hypothetical, with limitation to light work with occasional performance of postural activities and additional restrictions as to routine and repetitive tasks and contact with the public, coworkers, and supervisors, yielded testimony that jobs existed. T. 63-65.

---

[12]  She was terminated from her last job because of 2 episodes of syncope (passing out) in September and December 2014. Thereafter, she received treatment at the Cardiovascular Institute. Her test was negative for syncope in January 2015. T. 469.

In response to a hypothetical from claimant's counsel that tracked the marked restrictions in personal associations assigned by the treating psychiatrist (the ability to interact with supervisors and to respond appropriately to usual work situations and changes in routine work setting), the vocational expert testified that such a person could not sustain employment in the types of jobs identified in response to the Judge's third hypothetical. T. 66.

In her January 26, 2016 ruling, the ALJ found that claimant had severe impairments of: "disorders of the thyroid gland, disorders of the adrenal gland, affective disorder, and anxiety disorder." T. 22. The ALJ later stated, with respect to Addison's Disease and hypothyroidism: "There is no indication that either impairment has caused significant functional limitations." T. 28.

## ANALYSIS

### A.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the

proper legal standards were used in evaluating the evidence. [13]    "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[14] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[15]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed. [16]    In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[17] Conflicts in the evidence and credibility assessments are for the Commissioner to

---

[13]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[14]    *Villa v. Sullivan*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[15]    *Hames v. Heckler*, 707 F.2d at 164 (quoting *Hemphill v. Weinberger*, 483 F.2d 1137. 1139 (5th Cir. 1973), and *Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973)).

[16]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

[17]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1021; *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Carey v. Apfel*, 230 F.3d at 135; *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001).

resolve, not the courts.[18]   Four elements of proof are weighed by the courts in

determining if substantial evidence supports the Commissioner's determination:   (1)

objective medical facts, (2) diagnoses and opinions of treating and examining

physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the

claimant's age, education and work experience.[19]

**B.**    **Entitlement to Benefits**

The Disability Insurance Benefit ("DIB") program provides income to

individuals who are forced into involuntary, premature retirement, provided they are

both insured and disabled, regardless of indigence.[20]   Every individual who meets

certain income and resource requirements, has filed an application for benefits, and

is determined to be disabled is eligible to receive Supplemental Security Income

("SSI") benefits.[21]

The term "disabled" or "disability" means the inability to "engage in any

substantial gainful activity by reason of any medically determinable physical or

---

[18]    *Martinez v. Chater*, 64 F.3d at 174.

[19]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991); *Martinez v. Chater*, 64 F.3d at 174.

[20]    See 42 U.S.C. § 423(a).

[21]    42 U.S.C. § 1382(a)(1) & (2).

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[22]   A claimant shall be determined to be disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[23]

## C.     Evaluation Process and Burden of Proof

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.   This process required the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix

---

[22]     42 U.S.C. § 1382c(a)(3)(A).

[23]     42 U.S.C. § 1382c(a)(3)(B).

1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[24]   If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.   "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[25]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[26] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[27]   The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[28]

---

[24]      20 C.F.R. § 404.1520; see, e.g., *Wren v. Sullivan*, 925 F.2d at 125; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

[25]      *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[26]      20 C.F.R. § 404.1520(a)(4).

[27]      20 C.F.R. § 404.1545(a)(1).

[28]      20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps.[29]   At the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[30]   This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[31]   If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[32]   If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[33]

## D.    THE ALJ'S FINDINGS AND CONCLUSIONS

---

[29]    *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[30]    *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[31]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[32]    *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[33]    *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992), citing *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988).   See, also, 20 C.F.R. § 404.1520(a)(4).

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since July 5, 2012.[34]   This finding is supported by the evidence in the record.

At step two, the ALJ found that the claimant has the following medically determinable severe impairments: disorders of the thyroid gland, disorders of the adrenal gland, affective disorder and anxiety disorder (20 CFR 404.1520(c)).[35] This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[36] The claimant challenges this finding.

The ALJ found that the claimant has the residual functional capacity to perform light work except for the following: she can never climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs; occasionally balance, stoop, crouch, kneel and crawl; cannot work with moving and or dangerous machinery; cannot work at unprotected heights; and cannot engage in commercial driving. The

---

[34]      T. 22.

[35]      T. 22.

[36] T. 22.

claimant is limited to unskilled work that involves routine, repetitive tasks. The claimant is limited to occasional direct contact with public; occasional and superficial interaction with coworkers and supervisors. Generally, work should be with things rather than people. There should be no strict production quotas. The claimant challenges this finding.

At step four, the ALJ found that the claimant is not capable of performing her past relevant work as a cashier and a recreational aide. The claimant does not challenge this finding.

At step five, the ALJ found that the claimant was not disabled since July 5, 2012. The claimant challenges this finding.

E.    **THE ALLEGATIONS OF ERROR**

The claimant contends that the ALJ erred in: (1) failing to support the RFC with substantial evidence; (2) substituting her medical opinion for that of the treating physician; (3) relying on her own medical opinion in assigning the claimant's RFC; and (4) picking and choosing an evaluation of the evidence.[37]

1.  Whether Substantial Evidence Supports the RFC

---

37 The Court will consider the related errors (2), (3), and (4) together.

Claimant maintains that the ALJ's decision was not supported by substantial evidence. "Substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir.2000). It is "something more than a scintilla, but less than a preponderance." *Id*. The Commissioner has the responsibility of deciding any conflict in the evidence. *Id*. If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999) (citing 42 U.S.C. § 405(g)).

Only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence" exists to support the Commissioner's decision should the court overturn it. *Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir.1988). In applying this standard, the court is to review the entire record, but the court may not re-weigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. *Brown*, 192 F.3d at 496.

Plaintiff argues that the ALJ erred in assessing her RFC as a reduced range of light physical exertion. *R. 8*. RFC is defined as an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. *See* SSR 96-8p. Specifically, Plaintiff contends that

the ALJ failed to accommodate her disabling limitations from fatigue and depression.

As to depression, the ALJ noted that claimant had received mental health treatment since age 14 and presently sees psychiatrist Ravindra R. Reddy, M.D. for mental health treatment. The ALJ considered claimant's activities of daily living. The record provides that claimant is able to take care of her personal needs, perform household chores, and drive a car after being cleared by her cardiologist in January 2015. T. 20, 55-58, 210-213. She shops once a month with her husband, and they visit their son who attends college in Lafayette, Louisiana. T. 55-58. The ALJ found that claimant's activities of daily living also contradict her claim that she is unable to perform any work activity. It is appropriate for the finder of fact to consider the claimant's daily activities such as those described in physicians reports "when deciding the claimant's disability status." *Leggett v. Chater*, 67 F.3d 558, 565 n.12 (5th Cir. 1995).

Claimant's records indicate that she first began counseling with Sharon Steward, PhD, in February 2013 through January 2014. Dr. Steward documented claimant's positive response to counseling with a greatly improved mood in December 2013 and her GAF score went up to 80 by January 8, 2014. After a gap in treatment of 8 months, in September 2014, claimant began treatment with Dr.

Reddy who prescribed medication for depression and anxiety. Thereafter, he noted claimant's positive response to her renewed treatment. The records indicate that claimant's mental status findings were essentially within normal limits after she began treatment and started taking her prescribed medication.

The effectiveness of claimant's prescribed medication is further demonstrated by the time periods when Plaintiff stopped taking all medications on her own volition in December 2014 (which she reported when seeking treatment in August 2015), resulting in an increase in symptomatology, after which she was restarted on her medications. Even while off her medications, claimant told Dr. Reddy during a February 11, 2015 examination that she had only occasional feelings of hopelessness or helplessness, and that her appetite and sleep continued to improve. Dr. Reddy observed at that time that claimant had no evidence of psychosis or mania, no delusions or paranoia noted, and that she reported being compliant with her medications, which she said helped her. T. 424. She further described having only intermittent irritability at times, and stated that she had a good holiday season in December 2014.

As noted in the foregoing, claimant's medical reports reveal that she benefited greatly from mental health treatment when she received and participated in it consistently. *See Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988) (where

medication or treatment remedies or controls a medical impairment, such medical impairment is not disabling). Improved functioning while on medications and minimal symptoms while unmedicated are substantial evidence contradicting claimant's testimony that she is unable to work and experiences regular severe symptoms such as staying in bed at least four days per month because of depression.

Claimant also alleges experiencing disabling limitations from adrenal insufficiency, such as fatigue and nausea. The ALJ's ruling indicates that she considered these limitations and accounted for them by restricting claimant from working around dangerous machinery; unprotected heights; and commercial driving, as well as prohibiting any strict production quotas. T. 24.

The ALJ considered claimant's medical records during times of claimant's medication compliance as well as during her lack of compliance. May and June 2012, prior to her alleged onset date, claimant reported depression, hair loss, and fatigue to her primary physician, Eric J. Melancon, M.D. The ALJ noted however, that concomitant with claimant's primary care treatment, she was followed by Dr. Burshell, M.D., at Ochsner Foundation Hospital from March 2013 to March 2014. Dr. Burshell increased her Hydrocortisone. In a March 2014 follow up with Dr. Burshell, claimant stated that she was still feeling fatigued but better since the last

visit and that she had not had a crisis since July 2012, the date she alleges onset of disability. In particular, she reported to Dr. Burshell that she had not taken her medications for one week in February 2014 but received a steroid injection at the Urgent Care Clinic and doubled her medication dose for one week, with good results.

Thereafter, claimant was examined by consultative examiner Scuddy F. Fontenelle, III, Ph.D., on March 25, 2014. Dr. Fontenelle reported that claimant gave a history of receiving outpatient mental health treatment for anxiety and depression. He noted claimant's mood was depressed and her affect anxious. He opined, however, that claimant was able to understand job instructions and concentrate to a limited extent. Significantly, Dr. Fontenelle reported that claimant was not taking any psychotropic medications at the time of his evaluation.

As noted by the ALJ, "[claimant's] impairments are controlled and stable on medications and with the exception of a notation from Dr. Burshell that she reported a crisis in July 2012, there is no indication contained in the record of crises requiring hospital intervention." T. 28. While none of claimant's physicians assessed functional limitations upon her as a result of her physical impairments,

the ALJ considered the impairments to which she testified in setting forth her RFC assessment for a reduced range of light physical exertion.

The Court finds that the objective evidence supports the ALJ's RFC finding. *See Dale v. Chater*, 103 F.3d 127, 1995 WL 731619, at *3 (5th Cir. 1996) ("The ALJ properly concluded that the lack of objective medical evidence did not corroborate Plaintiff's complaints of disabling pain"); *Hollis v. Bowen*, 837 F.2d 1378, 1384-85 (5th Cir. 1988) (negative examination results and lack of objective factors supporting complaints of disabling pain may be properly considered by ALJ).

2. The ALJ Properly Considered the Medical Source of Record, and Did Not "Pick and Choose" Only the Evidence That Supported Her Conclusion.

Claimant contends that the ALJ failed to properly consider Dr. Reddy's opinions related to her activities of daily living and ability to work. Dr. Reddy completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" dated February 26, 2015, opining that claimant experienced "marked" restrictions on the ability to carry out complex instructions, make judgments on complex work-related decisions, interacting appropriately with the public or supervisors, and responding appropriately to usual work situations and to changes in a work setting. When asked to "Identify the factors (e.g., the

particular medical signs, laboratory findings, or other factors described above)
that support your assessment," Dr. Reddy indicated that claimant's assessment
was an "estimate," and that it only related to her condition prior to her start of
treatment in September 2014, "when I 1st saw her," the time period in which
claimant had gone untreated after discontinuing treatment with Dr. Steward in
January 2014. T. 325, 435.

Thus, Dr. Reddy's claims in the Medical Source Statement of Ability were
made before he ever began treatment of claimant and are contradicted by her
treating physician, Dr. Steward's, observations of a GAF score of 80 and
minimal symptoms in January 2014. A physician's statement that is contradicted
by other medical evidence, or is unsupported by the physician's own medical
findings (i.e., Dr. Reddy's pre-treatment estimate) is not creditable. *Greenspan
v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) (physician opinions unsupported by
the evidence are properly rejected for good cause).

Claimant further asserts that the ALJ engaged in "picking and choosing"
the medical evidence. An ALJ "must consider all the record evidence and cannot
'pick and choose' only the evidence that supports his position." *See Loza v.
Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). However, the Fifth Circuit has
indicated that no "pick and choose" error occurred where the ALJ considered all

of the evidence but decided to afford less weight to a particular physician's opinion. *See, e.g., Stephens v. Barnhart*, 174 F. App'x 232, 233 (5th Cir. 2006).

Here, the ALJ stated that she carefully considered the facts and also considered the entire record when assessing claimant's RFC, including specifically discussing Dr. Reddy's opinions. As stated above, the ALJ's action does not show "picking and choosing," but rather a proper review of the record and a resolution of the conflicts therein. Conflicts in the evidence are for the Commissioner to resolve. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990).

Thus, the records of Dr. Steward and Dr. Fontenelle constitute substantial evidence to support the ALJ's decision to afford only "some weight" to Dr. Reddy's opinions. What claimant characterizes as the ALJ substituting her own opinion is actually the ALJ properly interpreting the medical evidence to determine claimant's capacity for work. *Taylor v. Astrue*, 706 F.3d 600, 602–03 (5th Cir. 2012). The Court finds that the ALJ did not pick and choose evidence; her opinion is supported by substantial evidence.

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, this Court recommends that the Commissioner's decision be AFFIRMED and this case DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.   A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.   See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed in Lafayette, Louisiana, this 23rd day of August 2018.


CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE